UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOKESH MELWANI and CANTAL TRADE LTD.,

                        Plaintiffs,

-against-

HUNTER LIPTON, EAGLE POINT FINANCIAL LLC, and MDF HOLDINGS LLC,

                        Defendants.

**ORDER**

17 Civ. 8308 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        In this action, Plaintiffs Lokesh Melwani and Cantal Trade Ltd. ("Cantal") allege that in mid-2010 they invested $300,000 in Defendant Eagle Point Financial LLC ("Eagle Point"), representing a "32.5[%] equity stake" in the business. According to Plaintiffs, Defendant Hunter Lipton – who is the "managing and majority member of [Eagle Point]" – later sold Eagle Point and used the proceeds to create Defendant MDF Holdings LLC ("MDF"). According to Plaintiffs, although Lipton and Eagle Point "repeatedly promised to pay Plaintiffs their 32.5% share from the disposition of [Eagle Point]," they never did so. (Second Amended Complaint ("SAC") (Dkt. No. 51) ¶¶ 17-18, 20, 25)

        The SAC asserts claims for breach of contract, unjust enrichment, fraud, and conversion. (Dkt. No. 51) Pending before the Court is Defendants' motion to dismiss the SAC. (Dkt. No. 72) For the reasons stated below, Defendants' motion will be granted in part and denied in part.

## BACKGROUND

### I. FACTS[1]

Plaintiff Melwani resides in London, England, and Plaintiff Cantal is a British Virgin Islands company "wholly owned and operated by Melwani." (SAC (Dkt. No. 51) ¶¶ 3-4, 13)

Defendant Lipton is a citizen of New York. (Id. ¶ 14) Defendant Eagle Point is a New York limited liability company with its principal place of business in New York. (Id. ¶ 15) "At all times relevant, [] Lipton was the managing and majority member of [Eagle Point]." (Id. ¶ 17) Defendant MDF is a Nevada limited liability company; the SAC does not state its principal place of business. (Id. ¶ 16) MDF was "created or founded by" Lipton, and Lipton is the "chief or sole manager, owner[,] or operating agent" of MDF. (Id. ¶ 24) Jurisdiction is premised on diversity of citizenship. (Id. ¶ 7)

In "mid-2010" Melwani, Cantal, Lipton, and Eagle Point "entered into an agreement whereby Plaintiffs purchased a 32.5 percent equity stake in [Eagle Point] . . . in the amount of $300,000." (Id. ¶ 18) This sum was accepted by Defendants Lipton and Eagle Point. (Id.) "The foregoing agreement was memorialized [in], inter alia, . . . a series of e-mails between [] Melwani, [] Lipton, and [Eagle Point] in March, April, May, and June of 2010" (the "2010 emails"). (Id.)

In July 2011, Lipton "sold, transferred, or otherwise disposed of [Eagle Point] to a third party" for $ 1.2 million. (Id. ¶ 19) "Over the course of the next several months, [Lipton and Eagle Point] repeatedly promised to pay Plaintiffs their 32.5% share from the disposition of

---

[1] Unless otherwise indicated, the following facts are drawn from the SAC and are presumed true for purposes of resolving Defendants' motion to dismiss. Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

2

[Eagle Point], stating unequivocally that [] Lipton was personally holding Plaintiffs' money 'in escrow'...." (Id. ¶ 20) On December 1, 2011, "Defendants asserted that they now considered Plaintiffs' equity purchase to be a loan (interest free) to [Eagle Point,] and assured Plaintiffs that their original $300,000 investment would be repaid...." (Id. ¶ 21)

From December 2011 through "at least mid-2016," Defendants promised "on dozens of occasions" to repay Plaintiffs for their investment. (Id. ¶ 23) To date, Plaintiffs have received nothing from Defendants. (Id.)

The SAC alleges that MDF is either a successor-in-interest to Eagle Point "or was formed . . . with the proceeds of the [Eagle Point sale]" and is now "the holder, in due course, of the proceeds of the sale of Plaintiffs' 32.5% interest in [Eagle Point]." (Id. ¶ 25)

The 2010 emails referenced in the SAC are not attached to the SAC. Plaintiffs provided the 2010 emails to the Court prior to filing the SAC, however (see Dkt. No. 33),[2] and on a motion to dismiss, a court may consider documents that are extrinsic to the complaint "where the complaint 'relies heavily upon [the documents'] terms and effect,' which renders the document[s] 'integral' to the complaint." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)). Here, the SAC includes a claim for breach of contract that is founded, in part, on the 2010 emails. Accordingly, the 2010 emails are "integral" to the SAC, and the Court will consider them in deciding Defendants' motion.[3] See, e.g., id. at 153 n.4 (finding that contracts are integral to a complaint that is "replete with references" to them).

---

[2] Plaintiffs submitted the 2010 emails to the Court on May 7, 2018. (2010 emails (Dkt. No. 33) at 1 ("Attached are the emails that evince the contract that is at issue in this action.")).

[3] On February 6, 2019, Plaintiff Melwani filed an affidavit in opposition to Defendants' motion to dismiss. Attached to Melwani's affidavit is Defendant Lipton's LinkedIn profile and several

3

The 2010 emails referenced in the SAC were sent between Melwani – using a Gmail address – and Lipton – using an Eagle Point address – during the period between March 2, 2010 and June 30, 2010. (SAC (Dkt. No. 51) ¶ 18; 2010 emails (Dkt. No. 33) at 14-19)[4]

The first two emails – sent on March 2, 2010 – appear to be instructions for a wire transfer. The first email is from Lipton to Melwani. Lipton appears to be forwarding Eagle Point's bank account information to Melwani for purposes of a wire transfer. Lipton's email reads: "Deutsche Bank Trust Company Americas[, ]280 Park Avenue[, ]New York, NY 10017 ABA# 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F/B/O: Eagle Point Financial LLC[, ]Account Number # 42930388," and is signed "Hunter Lipton, EAGLE POINT FINANCIAL." (2010 emails (Dkt. No. 33) at 14) Melwani forwards Lipton's email to a third party, Reto Sigrist.[5] (Id.) Melwani's message to Sigrist reads: "Please send the 200,000 (two hundred thousand dollars as discussed)[.] Thank you[,] Lokesh[.]" (Id.) Sigrist replies: "Ok, will be done." (Id.)

The next six emails – all sent on March 3, 2010 – appear to relate to Melwani's investment in Eagle Point. For example, Lipton writes to Melwani, "I want to make a push in

---

emails between the parties sent between July 2011 and March 2016. (Dkt. No. 76) Plaintiffs do not rely on Melwani's affidavit and its exhibits in their opposition brief, much less explain why the Court should consider these documents in connection with Defendants' motion to dismiss.

Although the SAC refers to communications between Plaintiffs and Defendants between 2011 and 2016, it does not "rel[y] heavily upon [the emails'] terms and effect." Int'l Audiotext Network, Inc., 62 F.3d at 72. The 2011-2016 emails are thus not integral to the SAC. These emails have likewise not been incorporated by reference in the SAC. "Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate these documents, wholesale, into [a] complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004). Accordingly, in resolving Defendants' motion to dismiss, the Court has not considered either Melwani's affidavit or the exhibits attached to it.

[4] The page numbers referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

[5] Sigrist – who uses a Lloyds Bank email address – is not identified in the record.

4

LA," and "[w]e need to push more in [M]iami and [the NYC] club scene." (Id. at 18) Melwani asks Lipton: "With regards to figuring out my tax position. For now I need two things, one could you confirm that EP is not a sub chapter S corp. And two, would it be possible to get the most recent tax return?" (Id. at 17)

On June 30, 2010, Melwani sent the following email to Lipton:

Hunter,

Hope all is well. Just wanted to outline the deal we had discussed on the phone and the terms I am willing to proceed with.

1. $100,000 USD ([o]ne hundred thousand usd) for an additional 12.5% of the company.

2. The funds will be sent in two tranches, of $50,000 each. The first will be sent tomorrow, July 1st. The second at a date to be determined.

3. If the company feels it does not need the second $50,000, the company has the right to do so and my equity will be diluted accordingly.

4. The company and myself will work towards figuring out the most efficient method for repayment of the above, either through consultancy, and[/]or dividend payments.

5. During my next visit to New York we work towards putting together a shareholder agreement.

6. That you keep kicking ass in the sales department, a[n]d bringing in the big deals.

7. That we continue to work together with complete integrity, honesty, positive energy[,] and love in order to build a brilliant business.

Let me know if you agree,

Lokesh

(Id. at 19) Lipton replied later that day: "Agreed. With love[.]" (Id.)

## II. PROCEDURAL HISTORY

The Complaint was filed on July 26, 2017, in Supreme Court of the State of New York, New York County. (Notice of Removal (Dkt. No. 1) ¶ 1) On October 27, 2017, Defendants removed the action to this Court.[6] (Id.)

On October 5, 2018, Plaintiffs filed the SAC. (Dkt. No. 51) It raises claims for (1) breach of contract against Lipton and Eagle Point; (2) unjust enrichment against MDF; (3) fraud against Lipton; and (4) a conversion claim against all Defendants. (Id. ¶¶ 26-60)

On February 5, 2019, Defendants moved to dismiss the SAC. (Dkt. No. 72) On July 19, 2019, Defendants notified the Court that Defendant Lipton had filed a bankruptcy petition in the United States Bankruptcy Court for the District of Nevada. (Dkt. No. 80) Under 11 U.S.C. § 362(a)(1), Lipton is entitled to an automatic stay of "the commencement or continuation . . . of a judicial . . . proceeding against [him] that was . . . commenced before" he filed for bankruptcy. Id. Accordingly, on August 20, 2019, the Court stayed this matter as to Lipton. (Dkt. No. 82)

The Court then directed the parties to set forth their positions as to whether the stay should be extended to Lipton's co-defendants, Eagle Point and MDF. (Id.) After

---

[6] Defendants Lipton and Eagle Point are citizens of New York, and therefore were not entitled to remove this action to federal court. See 28 U.S.C. § 1441(b)(2) ("A civil action otherwise removable solely on the basis of [diversity jurisdiction] may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."). Section 1441(b) is "not 'jurisdictional in the true sense[,' however, and accordingly it can] be waived in the event that there [is] no timely request for a remand." Barnett v. Turner Const. Co., No. 02 Civ. 6863 (DLC), 2003 WL 329055, at *1 (S.D.N.Y. Feb. 13, 2003) (quoting Woodward v. D.H. Overmyer Co., 428 F.2d 880, 882-83 (2d Cir. 1970)); see also Handelsman v. Bedford Vill. Assocs. Ltd. P'ship, 213 F.3d 48, 50 n.2 (2d Cir. 2000) ("Because [defendant] was a citizen of New York, he was not entitled to remove to federal court [in New York]. . . . [Plaintff] waived his right to object to this procedural defect, however, by failing to raise the objection within 30 days of removal."). Accordingly, Plaintiffs have waived any objection to Defendants' removal.

6

considering the parties' submissions, the Court concluded that there was no basis for extending the automatic stay to either co-defendant, because any judgment as to Eagle Point or MDF would not impact Lipton's estate. (Dkt. No. 85 (citing Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282, 287-88 (2d Cir. 2003) (an automatic stay only applies to a debtor's co-defendants "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate"))

Accordingly, this Order addresses Defendants' motion to dismiss only as it applies to Eagle Point and MDF.

## DISCUSSION

### I. LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss[,] . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne. Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." Iqbal, 556 U.S. at 678.

7

## II. DEFENDANTS' MOTION TO DISMISS

In light of Lipton's bankruptcy filing, the Court addresses here Plaintiffs' breach of contract claim against Eagle Point; unjust enrichment claim against MDF; and conversion claim against Eagle Point and MDF.

In their motion to dismiss, Defendants do not dispute that an enforceable contract was formed between Cantal and Eagle Point. (See Def. Br. (Dkt. No. 73) at 16 ("a valid contract between Cantal and Eagle Point exists")) Defendants argue, however, that Melwani's claims must be dismissed, because he does not have standing to sue, having "not invest[ed] anything in Eagle Point individually." (Id. at 13) Defendants further contend that Plaintiffs' unjust enrichment and conversion claims fail, because they are premised on a breach of contract, and that the conversion claim is, in any event, time-barred. (Id. at 15-19) Finally, Defendants argue that all claims against MDF must be dismissed, because Plaintiffs have not pled facts demonstrating that MDF is Eagle Point's successor in interest. (Id. at 20-23)

### A. Melwani's Standing

Defendants argue that Melwani's claims should be dismissed, because he does not have standing to bring this action, having not personally invested in Eagle Point. (Id. at 13) According to Defendants, "the investment funds came from Cantal only," so "Cantal . . . owns 33.3% of Eagle Point, pursuant to a contract to which Melwani . . . [is] not a party." (Id. at 14-15) Based on the information that this Court can consider on a motion to dismiss, Defendants' argument is not persuasive.

As an initial matter, the SAC pleads that "Plaintiffs purchased a 32.5[%] equity stake in Eagle Point." (SAC (Dkt. No. 51) ¶ 18) To the extent that Defendants assert that the investment came only from Cantal, that argument is not support by the SAC or by the 2010

8

emails. Indeed, Cantal is not mentioned in the 2010 emails,[7] which appear to reflect an investment that Melwani is making in Eagle Point. Melwani communicates through a Gmail address – not through a Cantal email address – and he refers to "<u>my</u> tax position" and "<u>my</u> equity." He also writes that the "[t]he company and <u>myself</u> will work towards figuring out the most efficient method for repayment." (2010 emails (Dkt. No. 33) at 17, 19 (emphasis added)) In sum, based on the allegations in the SAC and the 2010 emails, Melwani appears to be "'assert[ing] his own legal rights and interests'" in this lawsuit. <u>Digizip.com, Inc. v. Verizon Servs. Corp.</u>, 139 F. Supp. 3d 670, 675 (S.D.N.Y. 2015) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975)). He therefore has standing to bring his claims.[8]

### B. <u>MDF's Successor in Interest Liability</u>

Defendants next argue that Plaintiffs have not adequately pled successor liability as to MDF. (Def. Br. (Dkt. No. 73) at 20)

Under both New York and Nevada law,[9] "the purchaser of a corporation's assets does not, as a result of the purchase, ordinarily become liable for the seller's debts." <u>Cargo</u>

---

[7] Defendants point to an August 2012 email from Lipton to Melwani stating that Cantal owns a 33.33% stake in Eagle Point. (Def. Br. (Dkt. No. 73) at 14; 2010 Emails (Dkt. No. 33) at 21) This email is not attached to or referenced in the SAC, nor is it integral to the SAC. Accordingly, it may not be considered in connection with Defendants' motion to dismiss.

[8] Defendants also argue that the SAC does not comply with Fed. R. Civ. P. 8, because it "fails to articulate how . . . Melwani – who did not invest anything in Eagle Point individually – has standing to assert Cantal's claims." (Def. Br. (Dkt. No. 73) at 13) As discussed above, the SAC and the 2010 emails do not demonstrate that Melwani did not invest in Eagle Point. As to Rule 8, dismissal is proper only where "the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." <u>Salahuddin v. Cuomo</u>, 861 F.2d 40, 42 (2d Cir. 1988). That standard is not met here. The SAC clearly alleges that Melwani and Cantal invested in Eagle Point, and that Defendants did not abide by their promises to return Plaintiffs' money after Lipton sold Eagle Point. (SAC (Dkt. No. 51) at ¶¶ 18-23)

[9] MDF is a Nevada limited liability company, and the SAC does not state where its principal place of business is. The parties have briefed the issue of successor liability under both Nevada

9

Partner AG v. Albatrans, Inc., 352 F.3d 41, 45 (2d Cir. 2003) (citing Schumacher v. Richards Shear Co., 59 N.Y.2d 239, 244-45 (1983); Arnold Graphics Indus. v. Indep. Agent Ctr., Inc., 775 F.2d 38 (2d Cir.1985)); Vill. Builders 96, L.P. v. U.S. Labs., Inc., 121 Nev. 261, 268 (Nev. 2005). There are four exceptions to this rule: where "(1) a buyer . . . formally assumes a seller's debts; (2) transactions [are] undertaken to defraud creditors; (3) a buyer . . . [has] de facto merged with a seller; and (4) a buyer . . . is a mere continuation of a seller." Cargo Partner AG, 352 F.3d at 45 (citing Schumacher, 59 N.Y.2d at 245; 10 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 4880 (2002)); Vill. Builders 96, L.P., 121 Nev. at 268.

Here, the SAC has not pled facts demonstrating that any of these exceptions apply. The SAC merely asserts that that MDF "is either the successor in interest to Eagle Point[,] or was formed, in whole or in part, with the proceeds of the sale of Eagle Point." (SAC (Dkt. No. 51) ¶ 25)

Plaintiffs argue, however, that the SAC pleads facts showing that the "sale was undertaken to defraud plaintiffs[,] as evidenced by plaintiffs' allegations that post-sale, Defendant Lipton has refused to pay plaintiffs for their equity stake and now states that plaintiffs' investment was merely a loan without interest." (Pltf. Br. (Dkt. No. 75) at 14) The

---

and New York law. "When a federal district court sits in diversity, it generally applies the law of the state in which its sits, including that state's choice of law rules." In re Coudert Bros. LLP, 673 F.3d 180, 186 (2d Cir. 2012) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). "Under the law of New York, . . . the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." Forest Park Pictures v. Univeral Tel. Network, Inc., 683 F.3d 424, 433 (2d Cir. 2012) (citing Allstate Ins. Co. v. Stolarz, 81 N.Y.2d 219, 223 (1993); Globalnet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 382 (2d Cir. 2006)). As explained above, there is no conflict between Nevada and New York law on this issue. Accordingly, the Court need not decide which state's law applies.

10

allegation that Lipton has not repaid Plaintiffs is not sufficient to plead that Eagle Point's assets were sold with the intent to defraud Plaintiffs, however, and the SAC pleads no other facts in support of this argument.

To the extent that Plaintiffs' claims against MDF are premised on the theory that MDF is a successor in interest to Eagle Point, those claims are dismissed.[10]

### C. Conversion

Defendants argue that Plaintiffs' conversion claim against Eagle Point and MDF cannot stand, because it "is entirely predicated on the breach of contract claim and alleges no independent facts sufficient to give rise to tort liability." (Def. Br. (Dkt. No. 73) at 17)

Plaintiffs' conversion claim is based on the following allegations:

> [P]laintiffs paid Defendants Lipton and Eagle Point for an equity stake in Eagle Point; [D]efendants sold or otherwise disposed of Eagle Point; [D]efendants have maintained all proceeds from the disposition of Eagle Point for their own benefit; and [D]efendants have not paid [P]laintiffs monies they are entitled to, but have instead used those monies to, inter alia, create Defendant MDF.

(Pltf. Br. (Dkt. No. 75) at 10) According to Plaintiffs, these allegations are "separate and apart from the issues associated with [P]laintiffs' breach of contract claims." (Id. at 10-11)

To plead a conversion claim under New York law,

> a plaintiff must allege: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."

---

[10] The SAC does not allege, and Plaintiffs have not argued, that MDF is Lipton or Eagle Point's alter ego.

11

In re JMK Constr. Grp., Ltd., 502 B.R. 396, 413 (Bankr. S.D.N.Y. 2013) (quoting Kirschner v. Bennett, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009)).[11]

"[A]n action for conversion cannot lie where damages are merely sought for breach of contract." Citadel Mgmt., Inc. v. Telesis Tr., Inc., 123 F. Supp. 2d 133, 148 (S.D.N.Y. 2000) (citing In re Chateaugay Corp., 10 F.3d 944, 958 (2d Cir. 1993) ("It is . . . settled under New York law that a tort claim will not arise 'where plaintiff is essentially seeking enforcement of the bargain.'") (quoting Sommer v. Fed. Signal Corp., 79 N.Y.2d 540 (1992))); Fraser v. Doubleday & Co., 587 F. Supp. 1284, 1288 (S.D.N.Y.1984); Matzan v. Eastman Kodak Co., 134 A.D.2d 863, 863 (4th Dept. 1987)). "For a conversion claim to succeed in the context of a dispute regarding a contract, the breach of contract must result in some 'wrong' that is separately actionable." Id. (citing Elma RT v. Landesmann Int'l Mktg. Corp., No. 98 Civ. 3662 (LMM), 2000 WL 297197 *3 (S.D.N.Y. March 22, 2000); N.Y. Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 316 (1995) (holding that a defendant may be liable in tort where it breaches a duty of reasonable care distinct from its contractual obligations, and where it engages in tortious conduct separate and apart from its failure to fulfill its contractual obligations)).

As an initial matter, the SAC does not plead facts that make out a conversion claim. Plaintiffs willingly gave money to Defendants, and that money was in Defendants' possession at the time of the alleged conversion. "The law presumes that ownership lies with the

---

[11] The law of Nevada is similar. Galvan v. J.C.H. Enterprises, Inc., No. 11 Civ. 307 (RLH), 2011 WL 4501083, at *3 (D. Nev. Sept. 27, 2011) ("Conversion is 'a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights.'" (quoting Evans v. Dean Witter Reynolds, Inc., 5 P.3d 1043, 1048 (Nev. 2000))).

12

person in possession of property or money." Id. at 150. Plaintiffs have not pled facts that rebut this presumption. Because the facts pled in the SAC demonstrate that the money at issue was in Defendants' possession at the time of the alleged conversion, Plaintiffs have not pled a conversion claim.

Moreover, Plaintiffs' conversion claim is premised on the same allegation underlying Plaintiffs' breach of contract claim – that Defendants have not returned Plaintiffs' investment. This allegation is not sufficient to make out a conversion claim. See AD Rendon Commc'ns, Inc. v. Lumina Ams., Inc., No. 04 Civ. 8832 (KMK), 2006 WL 1593884, at *3 (S.D.N.Y. June 7, 2006) (dismissing a conversion claim based on defendant's retention of plaintiff's money; defendant's conduct merely "constitute[d] a failure to perform duties obligated" under the parties' contract).

Accordingly, Defendants' motion to dismiss Plaintiffs' conversion claim will be granted.

### D. Unjust Enrichment

Finally, Defendants argue that Plaintiffs' unjust enrichment claim against MDF must be dismissed, because the existence of a valid contract is undisputed.

Defendants concede that "Cantal has a contract with Eagle Point by which it invested $300,000 in Eagle Point in exchange for a [33.33%] ownership interest." (Def. Br. (Dkt. No. 73) at 16 (brackets original)) Therefore, Defendants argue, Plaintiffs' unjust enrichment claim cannot stand.

Plaintiffs contend, however, that the parties dispute the nature of the contract that existed. Plaintiffs allege that there is a contract between Melwani, Cantal, Lipton, and Eagle

13

Point, whereas Defendants argue that there is a contract only between Cantal and Eagle Point. (Pltf. Br. (Dkt. No. 75) at 10)

"[A] contract is defined under New York law [as] 'an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound.'" Fisher v. Int'l Student Exch., Inc., 38 F. Supp.3d 276, 282 (E.D.N.Y.2014) (quoting Kowalchuk v. Stroup, 61 A.D.3d 118, 121 (1st Dept. 2009)). "'To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 95 (2d Cir. 2007) (quoting Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589, (1999)).

Here, although both sides contend that an enforceable contract exists, it is not entirely clear to the Court that a valid contract exists. Even if a valid contract exists, it is not clear who the parties to that contract are. The 2010 emails are vague and unspecific as to a variety of points. The 2010 emails do not explicitly state that Melwani is investing in Eagle Point, and they contain no mention of Cantal – an entity that both Plaintiffs and Defendants agree was a party to the contract. Accordingly, based on the 2010 emails, the Court cannot conclude that there was a "manifestation of mutual assent" that reflected true agreement on "all material terms."

The SAC states, of course, that the parties' agreement was memorialized in, "inter alia," the 2010 emails. (SAC (Dkt. No. 51) ¶ 18) Accordingly, the SAC asserts that the 2010 emails do not reflect the entirety of the parties' agreement. It is thus possible that an enforceable contract exists. It is also possible, however, that this Court may conclude – based on a more complete record – that there is no enforceable contract. "While a party generally may not

14

simultaneously recover upon a breach of contract and unjust enrichment claim arising from the same facts, it is still permissible to plead such claims as alternative theories." Singer v. Xipto Inc., 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012) (citing Fantozzi v. Axsys Techs., Inc., No. 07 Civ. 2667 (LMM), 2008 WL 4866054, at *3 (S.D.N.Y. Nov. 6, 2008); Bazak Int'l Corp. v. Tarrant Apparel Grp., 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004) (noting that a "plaintiff may simultaneously allege breach of contract and unjust enrichment in its complaint")). Accordingly, at this stage, Plaintiffs may plead unjust enrichment in the alternative to breach of contract.

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is granted as to Plaintiffs' conversion claim, and as to Plaintiffs' claims against MDF, to the extent that those claims are premised on a theory that MDF is a successor in interest to Eagle Point. Defendants' motion is otherwise denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 72).

There shall be a conference in this action on **October 23, 2019 at 4:30 p.m.** in Courtroom 705 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, NY. Any party seeking to move for summary judgment will submit a letter to the Court in accordance with Rule 4(A) of the Court's Individual Practices by **October 11, 2019**. Opposition letters are due **October 16, 2019**.

Dated: New York, New York
September 20, 2019

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge