UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

LOKESH MELWANI,

                          Plaintiff,

     -against-                               **ORDER**

EAGLE POINT FINANCIAL LLC,                  17 Civ. 8308 (PGG) (SLC)

                        Defendant.

------------------------------------------------------------

PAUL G. GARDEPHE, U.S.D.J.:

         Pro se Plaintiff Lokesh Melwani – the sole remaining plaintiff in this action – brings a breach of contract claim against Defendant Eagle Point Financial LLC – the sole remaining defendant. (Third Amended Complaint ("TAC") (Dkt. No. 111) ¶¶ 30-35) Eagle Point has renewed its motion for summary judgment, which was originally filed on February 28, 2022. (July 21, 2023 Eagle Point Ltr. (Dkt. No. 203); Eagle Point Sum. J. Mot. (Dkt. No. 163)) For the reasons stated below, Eagle Point's motion for summary judgment on Plaintiff Melwani's breach of contract claim will be denied.

## BACKGROUND

### I. FACTS

         The Court assumes familiarity with the facts of this long-running dispute, which are set forth in Magistrate Judge Cave's August 4, 2022 Report & Recommendation ("R&R"), to which no party objected, and which this Court accepted in its February 14, 2023 Order adopting the R&R. (R&R (Dkt. No. 173) at 2-13; Feb. 14, 2023 Order (Dkt. No. 184) at 3-4)[1]

---

[1] The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

In short, Melwani – through Cantal Trade Ltd. ("Cantal"), a company Melwani controlled – invested $300,000 in Eagle Point in 2010, in exchange for a 32.5 percent equity stake in Eagle Point. Eagle Point's principal, Hunter Lipton, had solicited Melwani's investment, and Melwani made the $300,000 investment pursuant to an oral agreement he entered into with Lipton in February 2010. At Melwani's direction, Cantal transferred $200,000 to Eagle Point on March 2, 2010, and transferred an additional $100,000 in several payments over the course of the year. (R&R (Dkt. No. 173) at **4-6**)

Because Melwani's agreement with Lipton was oral, the summary judgment record contains limited documentary evidence concerning the terms of the agreement governing Melwani's investment. It is, for example, not clear whether the party making the investment is Melwani or Cantal, or Melwani and Cantal. The primary documentary evidence regarding the alleged contract is email: (1) a February 25-March 2, 2010 email thread among Lipton, Melwani, and Melwani's bank regarding a $200,000 wire transfer; and (2) a June 30, 2010 email thread between Melwani and Lipton regarding the additional $100,000 investment.

The following is a screenshot of the February 25-March 2, 2010 email thread:

---------- Forwarded message ----------
From: **Sigrist, Reto (CH)** <Reto.SIGRIST@lloydsbank.ch>
Date: Tue, Mar 2, 2010 at 10:26 AM
Subject: RE: Wire
To: lokeshmelwani@gmail.com


Ok, will be done.

-----Original Message-----
From: lokeshmelwani@gmail.com [mailto:lokeshmelwani@gmail.com]
Sent: Tuesday, March 02, 2010 10:26 AM
To: Sigrist, Reto (CH)
Subject: Fw: Wire

Please send the 200,000 (two hundred thousand dollars as discussed)

Thank you,

Lokesh
------Original Message------
From: Hunter Lipton
To: Lokesh
ReplyTo: Hunter Lipton
Subject: Wire
Sent: 25 Feb 2010 18:41

Deutsche Bank Trust Company Americas280 Park AvenueNew York, NY 10017ABA# 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F/B/O: Eagle Point Financial LLCAccount Number: # 42930388

Hunter Lipton
EAGLE POINT FINANCIAL, LLC
T 212.207.3427
C 917.439.6278
F 646.417.5259
hlipton@eaglepointfinancial.com

The full text of the June 30, 2010 email thread – which has a blank subject line – is as follows:

> Melwani:
>
> Hunter,
>
> Hope all is well.
>
> Just wanted to outline the deal we had discussed on the phone and the terms I am willing to proceed with.
>
> 1. $100,000 USD (One hundred thousand usd) for an additional 12.5% of the company.
>
> 2. The funds will be sent in two tranches, of $50,000 each. The first will be sent tomorrow, July 1st. The second at date to be determined.
>
> 3. If the company feels It does not need the second $50,000, the company has the right to do so and my equity will be diluted accordingly.
>
> 4. The company and myself will work towards figuring out the most efficient method for repayment of the above, either through consultancy, and or dividend payments.
>
> 5. During my next visit to New York we work towards putting together a shareholders agreement.
>
> 6. That you keep kicking ass in the sales department, [and] bringing in the big deals.
>
> 7. That we continue to work together with complete integrity, honesty, positive energy and love in order to build a brilliant business.
>
> Let me know If you agree,
>
> Lokesh
>
> Lipton:
>
> Agreed. With love.

(Mullaney Decl., Ex. 2 (Compiled Emails) (Dkt. No. 164-2) at 14, 19)

In July 2011, Eagle Point's assets were sold to a third party for $1.2 million. (R&R (Dkt. No. 173) at 8) A schedule of Eagle Point's proposed payouts and an Eagle Point

4

balance sheet as of July 2011 list a $300,000 "loan" from Cantal as a liability. (Id.) Between July and October 2011, the sale proceeds – except for approximately $380,000 that remained in Eagle Point's attorneys' trust account and $100,000 that is unaccounted for – were distributed to Lipton and a number of third parties. (Id. at 8-9)

After the sale of Eagle Point, and during the period between July and December 2011, Melwani and Lipton discussed the sale of the company and the fact that Melwani had not received any proceeds from the sale. In email communications with Lipton, Melwani asserted that he had "'bailed [Eagle Point] out with 300 thousand dollars and own[ed] 32.5 percent of [it],'" while Lipton stated that "'[Eagle Point]'s position and proposal [was] that [Melwani's] funds were and are a loan'" of $300,000. (Id. at 9 (quoting Dkt. Nos. 76-2, 76-3)) In a later email, Lipton proposed a "payout [to Cantal] based on a 33% ownership position" in Eagle Point. (Id. at 9-10 (quoting Dkt. Nos. 164-2 at 20-21)) No payout was ever made to Melwani or Cantal, however. (Id. at 8-9 (listing recipients of sales proceeds, which do not include either Cantal or Melwani))

## II.   PROCEDURAL HISTORY

Melwani and Cantal filed the Complaint in Supreme Court of the State of New York, New York County, on July 26, 2017. The Complaint names Hunter Lipton, Eagle Point Financial LLC, and MDF Holdings, LLC as defendants. Defendants removed the case to this District on October 27, 2017. (Notice of Removal & Cmplt. (Dkt. No. 1)) Melwani and Cantal filed the First Amended Complaint on March 14, 2018 (Dkt. No. 26), and they filed the Second Amended Complaint ("SAC") on October 5, 2018 (Dkt. No. 51).

On August 20, 2019, this Court stayed the case as to Defendant Lipton, who had filed a bankruptcy petition in the U.S. Bankruptcy Court for the District of Nevada. (Dkt. No. 82)

Melwani and Cantal filed the TAC on August 20, 2020 (Dkt. No. 111). The TAC alleges that Lipton "misappropriate[ed] the proceeds from [the] sale [of Eagle Point]" to enable Defendant MDF Holdings LLC (then operating under the name GLS, LLC) – a company controlled by Lipton's father-in-law – to purchase the assets of Telecomica, a telecommunications business. (Id. ¶ 23; R&R (Dkt. No. 173) at 7) The TAC further alleges that Defendant MDF Holdings "was created or founded by [D]efendant Hunter Lipton, and [D]efendant Hunter Lipton remains the chief or sole manager, owner or operating agent of defendant MDF Holdings LLC." (Id. ¶ 28) The TAC asserts a breach of contract claim against Lipton and Eagle Point; an unjust enrichment claim against MDF Holdings; a fraud claim against Lipton; and accuses MDF Holdings of aiding and abetting a breach of fiduciary duty. (Id. ¶¶ 30-68)

On August 27, 2021, Melwani and Cantal voluntarily dismissed their unjust enrichment claim against MDF Holdings. (Dkt. No. 148)

On November 1, 2021, Plaintiffs' counsel moved to withdraw "due to a breakdown in communication and nonpayment of fees." (Dkt. No. 152) This Court granted counsel's motion on January 18, 2022, after advising Melwani that while he could proceed pro se, Cantal had to be represented by an attorney, and that if Cantal did not retain an attorney, its claims would be dismissed for failure to prosecute. (Dkt. No. 158)

On February 10, 2022, Defendants MDF Holdings and Eagle Point moved to dismiss Cantal's claims for failure to prosecute, because Cantal had not retained an attorney to represent it. (Dkt. No. 160) Melwani repeatedly sought additional time to retain new counsel for Cantal and himself. (Dkt. Sheet at Nov. 18, 2021 Minute Entry, Dec. 16, 2021 Minute Entry, Jan. 18, 2022 Minute Entry)

6

On February 28, 2022, Defendant Eagle Point moved for summary judgment on Plaintiffs' breach of contract claim, and MDF Holdings moved for summary judgment on Plaintiffs' claim that it had aided and abetted Lipton's alleged breach of fiduciary duty. (Dkt. No. 163) Melwani made pro se filings opposing Eagle Point and MDF Holdings' motion for summary judgment. (Dkt. Nos. 168-70)

In her August 4, 2022 R&R, Judge Cave recommends that MDF Holdings be granted summary judgment on Plaintiffs' aiding and abetting a breach of fiduciary duty claim, because there is no evidence that MDF Holdings knew about or encouraged the sale of Eagle Point, or that it received funds from the sale of Eagle Point. (R&R (Dkt. No. 173) at 20-21)

Judge Cave recommends that Eagle Point's motion for summary judgment on Plaintiffs' breach of contract claim be denied, however, because Plaintiffs could not obtain discovery from Lipton while the bankruptcy stay was in place, but with the bankruptcy stay lifted, discovery from Lipton might confirm Plaintiffs' claim of an enforceable contract:

> If discovery were complete as to all parties, the Court might agree with Eagle Point that Melwani's failure to establish the existence of an enforceable contract warrants dismissal of his Breach of Contract Claim. Discovery, however, is not complete with respect to Lipton, who remains subject to a stay. Given Lipton's role in the negotiation and formation of the 2010 Agreement, and his status as the managing and majority member of Eagle Point at all relevant times, it is possible that, following discovery from Lipton, Melwani may be able to establish that Lipton manifested an intent to bind himself and Eagle Point to an agreement. For example, Melwani will be able to seek discovery regarding Lipton's understanding of, and records reflecting, the parties' 2010 Agreement. Accordingly, at this stage in the litigation, the Court cannot conclude that Eagle Point has established the absence of any genuine factual dispute with respect to the Breach of Contract Claim.

(Id. at 25 (quotation omitted))

On September 19, 2022, this Court granted Defendants' motion to dismiss Cantal's claims for failure to prosecute, because Cantal had not retained counsel. (Dkt. No. 178) Having granted Plaintiffs' counsel's motion to withdraw on January 18, 2022, and having

7

repeatedly warned Melwani that Cantal could not proceed pro se (Dkt. Sheet at Nov. 18, 2021 Minute Entry, Dec. 16, 2021 Minute Entry, Jan. 18, 2022 Minute Entry), dismissal of Cantal's claims was proper at that time, because Cantal had not retained counsel during the period between January 18, 2022, and September 19, 2022. (See Dkt. No. 178) With the dismissal of Cantal's claims on September 19, 2022, Melwani became the sole remaining plaintiff.

No party objected to Judge Cave's August 4, 2022 R&R, and on February 14, 2023, this Court adopted the R&R, granting MDF Holding's motion for summary judgment on the breach of fiduciary duty claim, and denying Eagle Point's motion for summary judgment on Plaintiff Melwani's breach of contract claim. (Dkt. No. 184)

While the parties were litigating Plaintiffs' claims before this Court, Lipton's bankruptcy case was proceeding in Bankruptcy Court for the District of Nevada. On September 23, 2019, Melwani and Cantal filed an adversary complaint against Lipton in Lipton's bankruptcy proceeding. Melwani v. Lipton, Adv. Proc. No. 19-01094-abl, Dkt. No. 1 (Bankr. D. Nev. Sept. 23, 2019). The factual allegations in Melwani and Cantal's adversary complaint mirror their factual allegations against Lipton in the instant case. (Id. ¶¶ 8-15) On December 15, 2020, an order of discharge was issued in Lipton's bankruptcy case. In re Lipton, No. 19-13898-abl, Dkt. No. 170 (Bankr. D. Nev. Dec. 15, 2020). And on February 3, 2022, the bankruptcy court approved a stipulation of dismissal with prejudice as to the adversary proceeding that Melwani and Cantal had brought against Lipton. Melwani v. Lipton, Adv. Proc. No. 19-01094-abl, Dkt. No. 93 (Bankr. D. Nev. Feb. 3, 2022).

Given these developments in Lipton's bankruptcy case, in a February 15, 2023 Order, this Court (1) lifted the discovery stay as to Lipton; and (2) ordered Melwani to show cause why his claims against Lipton should not be dismissed. (Dkt. No. 185)

8

In a February 21, 2023 pro se submission, Melwani asserts that "Plaintiff's claims against Lipton in the adversary proceeding have not been adjudicated by the Bankruptcy Court"; that "[t]he claims have not been settled by any of the Parties"; that "[t]o allow the defendants to retain [Melwani's] funds would not be in the interests of justice"; that the stipulation "should in no way affect the claims before this Honorable Court"; and that "[t]he intention of the stipulation was to not prejudice the SDNY case." (Dkt. No. 188)

In a March 16, 2023 Order, this Court dismissed Melwani's claims against Lipton with prejudice, finding that the stipulation of dismissal in the adversary proceeding had res judicata effect on Melwani's claims against Lipton in the instant case. (Dkt. No. 190) As a result of this order, Eagle Point is the sole remaining defendant.

Although (1) this Court lifted the discovery stay as to Lipton; and (2) Judge Cave granted Melwani an extension of time to take discovery from Lipton (Dkt. No. 196), Melwani never took Lipton's deposition or any additional discovery. (July 12, 2023 Joint Ltr. (Dkt. No. 198) at 1 (Melwani stating, "I decided to not go ahead with the deposition of Mr. Lipton.")) Accordingly, in a July 13, 2023 Order, Judge Cave deemed discovery complete. (Dkt. No. 199)

Eagle Point renewed its motion for summary judgment on July 21, 2023, resting on its previously submitted summary judgment papers. (Dkt. No. 203) In a July 25, 2023 Order, this Court set August 8, 2023, as the deadline for any additional submissions from Melwani, stating that "[i]f Plaintiff does not make an additional submission by August 8, 2023, the Court will deem Eagle Point's motion fully submitted." (Dkt. No. 204)

Melwani did not make any additional submissions concerning Eagle Point's summary judgment motion. Accordingly, the motion will be decided on the basis of Eagle

9

Point's motion papers, and the opposition papers Melwani filed in March 2022. (See Dkt. Nos. 168-170)

## DISCUSSION

I.     **LEGAL STANDARDS**

    A.     **Summary Judgment**

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, "'[a] party may not rely on

10

mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Moreover, "'[t]he principles governing admissibility of evidence do not change on a motion for summary judgment[,]' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

A pro se party's submission is construed "'to raise the strongest arguments that [it] suggest[s].'" Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009) (quoting Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001)). "This lenient standard, however, does not relieve a pro se plaintiff of 'his duty to meet the requirements necessary to defeat a motion for summary judgment.'" Harry v. Suarez, No. 10 CIV. 6756 NRB, 2012 WL 2053533, at *2 (S.D.N.Y. June 4, 2012) (quoting Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003)). In light of Melwani's pro se status, this Court has independently reviewed the evidentiary record.

### B. Breach of Contract

Under New York law, the elements of a breach of contract claim are "'(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" Mindspirit, LLC v. Evalueserve Ltd., 346 F. Supp. 3d 552, 574 (S.D.N.Y. 2018) (quoting Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011)).

"[A] contract is defined under New York law [as] 'an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound.'" Fisher v. Int'l Student Exch.,

11

Inc., 38 F. Supp. 3d 276, 282 (E.D.N.Y. 2014) (quoting Kowalchuk v. Stroup, 61 A.D.3d 118, 121 (1st Dep't 2009)). "'To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 95 (2d Cir. 2007) (quoting Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589 (1999)).

"Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." Starke v. SquareTrade, Inc., 913 F.3d 279, 289 (2d Cir. 2019) (citing Express Indus., 93 N.Y.2d at 589). "'[A] mere agreement to agree, in which a material term is left for future negotiations, is unenforceable.'" Tractebel Energy Mktg., 487 F.3d at 95 (alteration in original) (quoting Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 109 (1981)). However, "'not all terms of a contract need be fixed with absolute certainty.'" Id. (quoting Express Indus., 93 N.Y.2d at 589). "'[A] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement.'" Id. (alteration in original) (quoting May Metro. Corp. v. May Oil Burner Corp., 290 N.Y. 260, 264 (1943)).

The absence of a writing that fully sets forth the parties' agreement is not necessarily fatal to a contract claim. "'Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document. . . . In any given case[,] it is the intent of the parties that will [control]. . . .'" Menlo v. Friends of Tzeirei Chabad in Israel, Inc., No. 11 Civ. 1978 (JPO), 2013 WL 1387057, at *2 (S.D.N.Y. Apr. 5, 2013) (quoting Winston v. Mediafare Ent. Corp., 777 F.2d 78, 80 (2d Cir. 1985). Accordingly,

"'[a]n oral agreement is binding except where the parties have explicitly made reference to an intention to be bound only by an executed written document.'" (Id. (quoting IBS Ketel, Ltd. v. Korea Telecom Am., Inc., No. 98 Civ. 4856, 2000 WL 821013, at *3 (S.D.N.Y. June 22, 2000) (citation omitted)).

"Under New York law, 'if a contract is unambiguous on its face, its proper construction is a question of law' that may be resolved on summary judgment." LVP Assocs. L.L.C. v. Bank of China, New York Branch, No. 17 CV 5274 (SHS), 2017 WL 5514523, at *4 (S.D.N.Y. Nov. 16, 2017) (quoting Gaia House Mezz LLC v. State St. Bank & Tr. Co., 720 F.3d 84, 89 (2d Cir. 2013)). "[W]hether the contract is ambiguous is [also] a question of law for the court." Law Debenture Tr. Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010). "Contract provisions are unambiguous if they 'have a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" LVP Assocs., 2017 WL 5514523, at *4 (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (1978)). By contrast, a contract is ambiguous "where its language is susceptible to multiple reasonable interpretations." Summit Health, Inc. v. APS Healthcare Bethesda, Inc., 993 F. Supp. 2d 379, 391 (S.D.N.Y. 2014) (citing Brad H. v. City of New York, 17 N.Y.3d 180, 186 (2011)). "Ambiguity will not be found," however, "where one party's view strains the contract language beyond its reasonable and ordinary meaning." Governmental Emps. Ins. Co. v. Ohio Cas. Grp., 47 F. Supp. 3d 190, 194 (S.D.N.Y. 2014) (internal citations and quotation marks omitted); see also Hugo Boss Fashions, Inc. v. Federal Ins. Co., 252 F.3d 608, 616 (2d Cir. 2001) ("[A]mbiguity does not exist simply because the parties urge different interpretations." (internal quotation marks and citation omitted)).

13

"'[E]xtrinsic evidence may not be considered unless the [contract] itself is ambiguous.'" Summit Health, 993 F. Supp. 2d at 390 (quoting Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade, 98 A.D.3d 403, 406 (1st Dep't 2012)); see also Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002) ("[I]f the court finds that the contract is not ambiguous[,] it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence . . . ." (internal quotation marks and citations omitted)). "When a contract is ambiguous and there is relevant extrinsic evidence as to the parties' intent, the proper interpretation of the disputed language [is generally] a question of fact for the jury." Summit Health, 993 F. Supp. 2d at 391 (citing Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)); see also Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 567 (2d Cir. 2011) ("[C]ontract claims are generally not subject to summary judgment[ ] if the resolution of [the] dispute turns on the meaning of an ambiguous term or phrase.").

"Although a determination that a contract is ambiguous ordinarily requires denial of summary judgment, the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is so one-sided that no reasonable person could decide to the contrary." New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 115 (2d Cir. 2010) (internal quotation marks and citation omitted). "Similarly, summary judgment may be granted despite any ambiguities in the contract where there is no extrinsic evidence that would support a resolution of [the] ambiguities in favor of the nonmoving party's case." Id. (internal quotation marks and citations omitted). "These apparent exceptions merely reinforce the principle that the lynchpin of a summary judgment determination is, in most cases, the existence vel non of genuine issues of material facts." Id.

## II.  ANALYSIS

Eagle Point contends that it is entitled to summary judgment on Melwani's breach of contract claim because Cantal – and not Melwani – is the "real party in interest," and Melwani therefore lacks standing to pursue a breach of contract claim. (Def. Br. (Dkt. No. 166) at 20) According to Eagle Point, "Melwani is attempting to . . . assert Cantal's legal rights as if they were his." (Id.)[2] Eagle Point further contends that there is no "manifestation of mutual assent," given that "it is not clear who the parties to the contract are." (Id. at 21)

Eagle Point concedes, however, that

> Plaintiff Cantal Trade Ltd. transferred $300,000.00 to Eagle Point Financial LLC ("Eagle Point") in exchange for 32.5% ownership of Eagle Point. . . ."

(Def. R. 56.1 Stmt. (Dkt. No. 167) ¶ 1; see also Def. Br. (Dkt. No. 166) at 21 ("It is undisputed that Cantal invested all of the disputed funds into Eagle Point.").

Melwani – for his part – asserts that

> [i]t is undisputed that Mr. Lipton sought funds from Mr. Melwani in or around January of 2010, and that Melwani ultimately invested funds through Plaintiff Cantal Trade Ltd. ("Cantal") into the Eagle Point venture. It is further undisputed that Plaintiffs thereby acquired a 32.5% stake in Eagle Point.

(Pltf. Reply to Defendants' Motion for Summary Judgment ("Pltf. Reply") (Dkt. No. 168) at 2)

Melwani further contends that "the agreement made [regarding his investment in Eagle Point] was between myself and [Eagle Point Financial]. Cantal was simply a vehicle that I used to transfer the funds. In any event Cantal is a company wholly owned and controlled by me." (Id. at 6)

---

[2] Eagle Point also argues that "shareholders in New York corporations may not sue third parties directly for harms those third parties have caused to a corporation." (Id. (citing Salomon v. Burr Manor Ests., Inc., 769 F. Supp. 2d 83, 91 (E.D.N.Y. 2011); Solutia Inc. v. FMC Corp., 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005). The TAC pleads, however, that Cantal is a "British Virgin Islands company." (TAC (Dkt. No. 111) ¶ 13)

        Melwani also contends that

> [f]rom the date of the sale of [Eagle Point Financial] I have not received a single dime from the Lipton family or [Eagle Point Financial]. My 32.5% stake should have netted me $390,000. Instead Mr. Lipton paid himself and his wife Tara Lipton the bulk of the one point two million dollars, approximately eight hundred and fifty thousand dollars.

(Id. at 4)

        Eagle Point has not disputed Melwani's claim that he never received "a single dime" after the sale of Eagle Point, despite his $300,000 investment, which represented a 32.5% stake in the company. (Def. R. 56.1 Stmt. (Dkt. No. 167) ¶¶ 1, 63-68) (showing disbursement of proceeds from sale of Eagle Point, with Hunter and Tara Lipton receiving $480,000, $380,464.46 being unaccounted for, and Melwani/Cantal receiving nothing).

        Eagle Point has also not disputed Melwani's claim that – after the sale of Eagle Point – Lipton repeatedly assured Melwani that his $300,000 investment would be repaid:

> Throughout the years from the sale of [Eagle Point Financial] Mr. Lipton constantly assured me that I would be paid in full for my capital contribution at the very least. There were constant emails about making me 'whole' again. He was trying to convert my equity interest into a loan to reduce the liability. These series of emails go on until 2016. . . .

(Pltf. Reply (Dkt. No. 168) at 5)  Eagle Point has likewise not disputed Melwani's claim that Lipton repeatedly acknowledged Cantal's $300,000, 32.5% stake in Eagle Point. (Def. R. 56.1 Stmt. (Dkt. No. 167) ¶¶ 1, 57, 59 (variously describing Cantal's investment as a $300,000, "32.5% ownership" interest in Eagle Point; as a $300,000 loan to Eagle Point; and as a "reclassified . . . $300,000 loan-liability to a partner distribution after liability, reflecting a proposed 33% distribution to Cantal. . . .")  And the emails between Lipton and Melwani cited by Melwani do in fact contain representations from Lipton that he will make payment. (See Pltf. Reply (Dkt. No. 168) at 16 (Mar. 30, 2015 Lipton email to Melwani stating that "money will be sent to Cantal or your US company" and that Lipton "need[s] . . . payment instructions"); at 19

16

(Dec. 8, 2015 Lipton email to Melwani ("I will be sending you out the paperwork and I am working on amounts but hopefully we can get it done next week.")); at 21 (Mar. 6, 2016 Lipton email to Melwani ("We can start payments this week. I just want to start getting monies sent over and start cleaning this up.")); at 25 (Aug. 1, 2014 Lipton email to Melwani ("Can you email me the entity you sent the money from and where and what company we will be sending the money to.")))

In sum, it is undisputed here that there was an agreement by which $300,000 was invested in Eagle Point in exchange for a 32.5% stake in the company. Eagle Point asserts that that investment was made by Cantal, and that Melwani lacks standing to assert Cantal's rights (Def. Br. (Dkt. No. 166) at 20), while Melwani contends that he personally entered into an agreement with Eagle Point, and merely used Cantal – his wholly owned corporate entity – as the vehicle through which the payments to Eagle Point were made. (Pltf. Reply (Dkt. No. 168) at 6)

The Court concludes that there are material issues of fact as to whether Melwani or Cantal was the contracting party, or whether the contracting parties were both Melwani and Cantal. The 2010 emails cited by the parties make no mention of Cantal, and in the June 30, 2010 email thread, Melwani speaks of taking action on his own. (Mullaney Decl., Ex. 2 (Compiled Emails) (Dkt. No. 164-2) at 19 (Melwani stating that Eagle Point "and myself will work towards figuring out the most efficient method for repayment. . . ."; "During my next visit to New York we work towards putting together a shareholder agreement."; "we continue to work together")) Melwani has also asserted that the agreement at issue was between himself and Eagle Point. (Pltf. Reply (Dkt. No. 168) at 6) In sum, nothing in the record demonstrates as a matter of law that Eagle Point contracted with Cantal rather than with (1) Melwani, or (2) Melwani and Cantal.

17

And while Eagle Point contends that there was no "manifestation of mutual assent" – because it is not clear what party was making the investment in Eagle Point (Def. Br. (Dkt. No. 166) at 21) – it is undisputed that a $300,000 investment was made in Eagle Point in exchange for a 32.5% interest in the company. (Def. R. 56.1 Stmt. (Dkt. No. 167) ¶ 1)  There was thus a meeting of the minds as to the essential terms of the transaction.  While this Court cannot rule as a matter of law whether Melwani, Cantal, or Melwani and Cantal contracted with Eagle Point concerning that investment, that ambiguity does not alter the fact that – as Eagle Point concedes (see id.) – the terms of the investment were clear.

Accordingly, Eagle Point's motion for summary judgment on Melwani's breach of contract claim will be denied.

## CONCLUSION

For the reasons set forth above, Eagle Point's renewed motion for summary judgment (Dkt. No. 203) is denied.  The Clerk of Court is directed to terminate the motion (Dkt. No. 203).

Given that the parties waived a jury trial (see Dkt. No. 58), this case will proceed to a bench trial on **February 5, 2024, at 9:30 a.m.**, in Courtroom 705 of the United States Courthouse, 40 Foley Square, New York, New York.  The parties' joint pretrial order and any motions in limine are due by **January 12, 2024**, and responses are due by **January 19, 2024, 2023**.  The parties should consult this Court's Individual Rules – available on the website of the U.S. District Court for the Southern District of New York – regarding the applicable procedures

and necessary filings for a bench trial.  See Individual Rules for Civil Cases, Rule X(C).

Dated: New York, New York
       December 21, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge